IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

ABELARDO RENTERIA-PEREZ,

Defendant.

CRIMINAL ACTION NO.

1:19-cr-492-JPB-CMS

## **FINAL REPORT AND RECOMMENDATION**

On December 3, 2019, a Grand Jury sitting in the Northern District of Georgia returned a three-count indictment against Defendant Abelardo Renteria-Perez ("Renteria") and his co-defendant, Jennyfer Perez-Hernandez, charging them with drug-related offenses. [Doc. 18]. Renteria has filed a motion to suppress statements [Docs. 39, 42] and a motion to suppress evidence [Docs. 40, 43]. I held an evidentiary hearing on July 9, 2020, via Zoom.[1] [Doc. 60]. Following the hearing, Renteria filed a supplemental brief, the Government responded, and Renteria filed a reply. [Docs. 69, 74, 85].

---

[1] Renteria consented to having the hearing conducted by videoconference, and he filed a waiver of his appearance. [Doc. 52; Doc. 60 at 3].

## I.   Evidence Presented at the Evidentiary Hearing[2]

The Government presented its evidence through the testimony of Sergeant Anthony Petron, a bi-lingual (Spanish/English) officer with the Brookhaven Police Department who was working with agents from Homeland Security Investigations ("HSI") on this case. [Doc. 60, Transcript ("Tr.__"), at 17–19]. Sergeant Petron testified that on October 31, 2019, a suspicious package arrived at the FedEx hub in Memphis, Tennessee that had been shipped from Mexico. [*Id.* at 22; Doc. 58-1 at 4 (Gov. Ex. 3)]. The package was addressed to Larry Hernandez at 913 Creekside Way, in Roswell, Georgia. [Tr. at 25; Doc. 58-1 at 2 (Gov. Ex. 2)]. Agents from Customs Border Protection x-rayed the package, which revealed anomalies. [Tr. at 22]. After further investigation, the agents discovered that the package contained

---

[2] In a pre-hearing brief, the Government argued that Defendant did not have standing to challenge the warrantless search of the apartment. [Doc. 48; Doc. 60 at 4]. At the hearing, however, Renteria presented a lease for the apartment with his name on it as well as an affidavit saying that the apartment was his residence. [Doc. 60 at 5–16; Doc. 57 at 2 (Def. Ex. 1); Doc. 57-1 at 2 (Def. Ex. 2)]. During the hearing, the Government's witness described one of the bedrooms at the apartment as Renteria's room and noted that during the search of that room, they discovered Renteria's ID cards and cell phone on the bed. [Doc. 60 at 37, 43, 51, 53–55, 68]. When the prosecutor persisted in arguing that there was no standing, I stated that I would proceed with the hearing, but that the Government could brief the standing issue. [*Id.* at 16]. In its post-hearing brief, the Government still does not concede that Renteria has standing, but also does not address the evidence presented at the hearing. [Doc. 74 at 2 n.1]. I easily conclude that Renteria has standing to challenge the constitutionality of the search of the apartment.

several items, including carfentanil, a strong fentanyl-type illegal substance.  [*Id.* at 22, 26–27].

Law enforcement officers removed the illegal drugs and replaced them with a "sham," an item designed to simulate the weight of the drugs.  [Tr. at 27–28].  The package was sent to HSI agents in Atlanta, Georgia.  On November 6, 2019, United States Magistrate Judge Christopher C. Bly executed a warrant authorizing the use of a tracking device in the package.  [*Id.*; Doc. 74-1 at 1–3].  The same day, the agents obtained an anticipatory search warrant authorizing a search of 913 Creekside Way, in Roswell, Georgia, but only if the agents received a signal from the tracker indicating that it had been opened within that location.  [Doc. 74-1 at 3–5].  The HSI agents then arranged for a controlled delivery.   [Tr. at 27].

On November 6, 2019, an uncover agent went to the Creekside Way address, knocked on the door, and when no one answered the door, left the package at the front door.  [Tr. at 28].  Other law enforcement officers were conducting on-site surveillance on the package and monitoring the electronic tracking device.  [*Id.*].  Eventually someone arrived at the location and took the package inside.  After thirty minutes, it appeared that no one had opened the package, and agents conducted a "knock and talk."  [*Id.* at 28–29].

Agents spoke with a woman, who said that her live-in boyfriend goes by the name Larry Hernandez, the name listed on the shipping label. [Tr. at 29]. The woman called Larry on the phone, who then came to the apartment and spoke with the officers. [*Id.*]. Larry advised that the package was not for him and that he had agreed to have the package delivered in his name to his residence on behalf of one of his co-workers named Cocho. [*Id.*]. Under the direction of law enforcement, Larry then called Cocho, who said that his cousin, Gordo (a nickname used for heavyset people), would come get the package. [*Id.* at 30]. They left the package outside to be picked up and continued surveillance on it. [*Id.*].

The following day, a heavyset man driving an orange Honda Element picked up the package. [Tr. at 30–32; Doc. 58-1 at 6 (Gov. Ex. 4)]. HSI personnel followed the Honda, which made multiple, very aggressive attempts to evade surveillance. [*Id.* at 32–33]. Sergeant Petron testified that because of the counter-surveillance techniques that the Honda's driver had employed, the agents decided to stop following the Honda and instead rely only on the tracking device. [*Id.* at 33]. The tracker signal eventually led them to the Stanford Apartments in Tucker, Georgia, where they located the Honda that had backed into an unmarked parking spot in front of Building "O," directly in front of Apartment O-10. [*Id.* at 33–34, 36]. There was no one in the Honda when they arrived.

4

The agents set up stationary surveillance on the Honda, and after a short period of time, the heavyset man they had seen earlier at the Roswell apartment exited Apartment O-10, walked to the Honda, retrieved the package, and re-entered Apartment O-10.  [Tr. at 34].  Sergeant Petron testified that leaving the package in the car instead of taking it inside immediately was a countersurveillance technique.  [*Id.* at 34–35].  Shortly after that package was taken inside the apartment, the agents received an "unusual notification" on the software indicating that the tracking device was compromised.  [*Id.*].  According to Sergeant Petron, the only way that the device could be compromised would have been for someone to open the package and tamper with it.  [*Id.* at 35].

Believing that the package had been opened, the HSI agents requested and received assistance from the DeKalb County Police to assist with a "knock and talk." [Tr. at 35].  The agents wanted to have a uniformed law enforcement presence there for two reasons—to be a "clear sign" that police were at the location and to provide additional manpower because they did not know how many people were in the apartment.  [*Id.* at 35–36, 89].   Sergeant Petron testified that although the agents knew that Renteria was inside the apartment with the package, they did not know who else might be with him.  Sergeant Petron was also concerned because there were

multiple other cars parked directly in front of Building "O" that could have been driven by people inside Apartment O-10. [*Id.* at 36].

After the DeKalb County Police officers arrived, there was a significant police presence on the scene—five plain-clothed HSI personnel as well as multiple members of the DeKalb County Police Department. [Tr. at 81, 86–87]. Once everyone was in place, Sergeant Petron knocked on the door, and commanded in a loud voice, "Police. Come to the door." [*Id.* at 84]. Approximately ten seconds later, he again gave the command. [*Id.*]. And he knocked again, for a total of twenty to thirty seconds of knocking. [*Id.* at 85]. His knocking became more persistent, and he said in a louder voice, "Police, come to the door now." [*Id.* at 86]. Sergeant Petron testified on cross-examination that he was not asking that the door be answered; he was commanding it. [*Id.* at 86, 116–17].

Approximately one minute after Sergeant Petron first knocked, the man who had been driving the orange Honda Element—who was later identified as Renteria—answered the door. [Tr. at 87]. As he exited the apartment, his hands were raised in a gesture of submission, and he kept his hands raised for several seconds. [*Id.* at 90]. Sergeant Petron then changed his tone, conversationally asking Renteria to exit the apartment, and Renteria then complied. [*Id.* at 43–45, 87–88, 116]. During this

encounter, Sergeant Petron's firearm was in its holster, but his hand was near it so that he was prepared to draw it if necessary. [*Id.* at 88].

After Renteria stepped outside, Sergeant Petron looked into the apartment and saw that there was no furniture inside the living room or dining room. He also could see the package. It was opened, and its contents had been removed from the box. [Tr. at 37, 57]. The body camera video from one of the DeKalb County officers who was at the door with Sergeant Petron confirmed that the open package was visible from the front door. [*Id.* at 43]. Sergeant Petron could also see that it was a two-level apartment, with the stairs visible from the front door. [*Id.* at 36–37].

Sergeant Petron asked Renteria if there was anyone else inside, and Renteria stated that his cousin Jennyfer was inside the apartment. [Tr. at 44, 90]. Sergeant Petron then called out, or yelled, for Jennyfer to come outside. About thirty seconds later, Jennyfer came to the door, at which point she was directed to exit the apartment. [*Id.* at 46, 90–92]. Sergeant Petron asked if there were any other people in the house, but he received no response. [*Id.* at 46–47]. He also testified that while he was standing at the entrance with the front door open, he could hear the sound of rushing water from a bathtub, which caused him to believe that there was an attempt to destroy drug evidence by running it through the tub. [Tr. at 44, 56–57, 91].

Sergeant Petron testified that at this point, the officers conducted a safety check. [Tr. at 47]. He made this decision based on his training and experience which led him to believe that it is possible that other people might have been hiding in the apartment. He testified that in deciding to do the safety check, he considered the fact that the package had been opened and the device had been compromised. [*Id.* at 47, 92]. He testified that the officers looked only in the areas where people could hide. [*Id.* at 47]. The officers drew their weapons while they were performing the safety check, which lasted approximately one minute. [*Id.* at 48, 93]. During the safety check, officers saw "in plain sight" an empty large Ziploc-type bag in the toilet. [*Id.* at 47–48, 53, 65]. The bag was removed from the toilet after the sweep to prevent it from being inadvertently disposed of. [*Id.* at 52; Doc. 58-1 at 30 (Gov. Ex. 17)]. On cross-examination, Sergeant Petron testified that it was possible to look into the bathroom by standing in the "vestibule area" outside the bathroom. [*Id.* at 96, 103].

During the safety check, Renteria and Jennyfer were handcuffed and placed in the back of police vehicles. [Tr. at 98–99]. According to Sergeant Petron, they were not under arrest at that time but rather were the subject of an "investigative detention." [*Id.* at 98, 100]. After the safety check was complete, the handcuffs

were removed and Renteria and Jennyfer were brought back into the house.  [*Id.* at 112–13].

Sergeant Petron testified that Renteria provided the agents with both verbal and written consent to search the apartment.  The verbal consent was given while Renteria was outside, and the written consent was given later, in the kitchen.  [Tr. at 59, 61, 112; Doc. 58-1 at 26, 28 (Gov. Exs. 15, 16)].  Sergeant Petron testified that he explained the written consent form to Renteria in Spanish, and Renteria had no questions about it and was calm and collected.  [Tr. at 62].

After obtaining written consent from Renteria, the officers searched the apartment.  During this time, Renteria and Jennyfer were in the living room.  [Tr. at 62; Doc. 58-1 at 8 (Gov. Ex. 6)].  During the search, the officers located in the bathroom trashcan the sham from the package as well as two large Ziploc-type bags containing a grayish-white powdery substance that was later determined to be fentanyl.  [*Id.* at 63–67; Doc. 58-1 at 32, 34 (Gov. Exs. 18, 19)].

After the agents finished the search and collected all of the evidence, they placed Renteria and Jennyfer under arrest.  [Tr. at 71].  Renteria was given *Miranda* warnings in Spanish.  [*Id.* at 71–72; Doc. 58-1 at 42 (Gov. Ex. 23)].  In addition, he signed ICE Form 73-025, which states: "I have read, or someone has read to me, this statement of my rights and I understand what my rights are. At this time, I am willing

to answer questions without a lawyer present." [Tr. 71-72; Doc. 58-1 at 42, 44 (Gov. Exs. 23, 24)]  Sergeant Petron testified that Renteria was calm during this time, and that law enforcement made no promises or threats to coerce him to waive his *Miranda* rights.  [Tr. at 74].  After receiving the *Miranda* warnings, Renteria made certain statements.[3]  [*Id.* at 75].

## II.    Motion to Suppress Evidence

Through his motion to suppress evidence, Renteria challenges the legality of the entry into the apartment, the scope of the safety check, and the validity of the consent given for the search.  In its post-hearing brief, the Government argues that the entry into the apartment was lawful based on the exigent-circumstances exception to the warrant requirement; that the safety check was appropriate and necessary; and that Renteria's consent for the search was voluntary.  I will address these issues in turn.

---

[3] Renteria also apparently made a statement before he was Mirandized regarding the two bags of drugs that were located during the search.  [Tr. at 74–75, 111].  The Government, however, had advised the Court that it does not intend to use that statement in its case-in-chief.  [Doc. 74 at 14 n.6].  As such, I have not addressed it further in this R&R.

10

**A. *The entry into the apartment***.

Renteria contends that the officers violated the Fourth Amendment by unlawfully compelling him to open the door.  He argues that given the show of force and the commanding tone and words that Sergeant Petron used, no reasonable person in Renteria's position would have understood that he had the choice to ignore the officers and not open the door. [Doc. 69 at 18–19].  He also argues that the encounter exceeded the scope of a permissible "knock and talk"[4] because it was evident that the officers intended to search the apartment.  [*Id.* at 21–22].  In response, the Government argues that the officers were entitled to enter the apartment based on the exigent-circumstances exception to the warrant requirement due to the risk that the people inside the apartment would destroy contraband or evidence.  [Doc. 74 at 14–29].

Under the Fourth Amendment to the U.S. Constitution, every search or seizure by a government agent must be reasonable.  *See* U.S. CONST. amend. IV. Accordingly, a search or seizure must normally be conducted under the authority of

---

[4] A "knock and talk" occurs when a police officer, not armed with a warrant, approaches a home and knocks. *See Florida v Jardines*, 569 U.S. 1, 8 (2013).  No warrant is needed for such an encounter because there is an implicit license that all individuals (including police officers) have to "approach [a] home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." *Id.*

11

a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Mincey v. Arizona*, 437 U.S. 385, 390 (1978). Warrantless searches are "per se unreasonable " under the Fourth Amendment, unless they fall into one of a few well-delineated exceptions. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009); *United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law.").

One such exception is exigent circumstances, which permits warrantless searches if (1) there is probable cause to believe that contraband or evidence are present, and (2) there exist exigent circumstances (in this case, a reasonable belief that the suspect may destroy the contraband or evidence). The Eleventh Circuit has explained:

> With regard to an officer's entry into a person's home, a person does not show consent to enter when the consent is prompted by an official show of authority. However, as to warrantless searches, they may be justified where both probable cause and exigent circumstances exist. Probable cause exists when under the totality-of-the-circumstances . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. In other words . . . where the facts lead a reasonably cautious person to believe that the search will uncover evidence of a crime. Exigent circumstances may exist where there is a danger that evidence will be destroyed or removed. However, the presence of contraband without more does not give rise to exigent circumstances, but such circumstances may arise where there is a

12

danger that the contraband will be destroyed. ***This Court has held that the need to invoke the exigent circumstances exception to the warrant requirement is particularly compelling in narcotics cases because narcotics can be so quickly destroyed.*** In determining whether exigent circumstances existed, we employ the following objective test: whether the facts, as they appeared at the moment of entry, would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.

*United States v. Floyd*, 247 F. App'x 161, 165–66 (11th Cir. 2007) (internal citations and quotation marks omitted, emphasis added). Thus, here we must examine the evidence presented at the hearing to determine (1) whether there was probable cause to believe that contraband or evidence of a crime was present at the apartment; <u>and</u> (2) whether there was an imminent danger that the contraband or evidence would be destroyed.

### i.    *Probable Cause*

In this case, I easily conclude that there was probable cause to believe that evidence or contraband would be found in Apartment O-10. The agents had already obtained an anticipatory search warrant for the Creekside Way address listed on the package's mailing label. [Doc. 74-1 at 4–5]. The fact that the warrant became useless after the agents revealed themselves to the woman at the apartment does not change the fact that Judge Bly had already concluded that it was appropriate to search the location where the package was being delivered. Presumably, the same facts that convinced Judge Bly to sign the warrant for the Creekside Way address

would also support probable cause to search Apartment O-10.  But there was much more evidence to support probable cause to search Apartment O-10 than there was to search the Creekside Way residence.  For example, Renteria had arranged to pick up a package that was not addressed to him; immediately after picking up the package, Renteria engaged in various anti-surveillance activities; the agents observed Renteria take the package into Apartment O-10; and the tracker device was disabled just minutes after the package was taken into the apartment.  These additional facts demonstrated that the people inside Apartment O-10 knew that the package contained something illegal and were attempting to avoid detection.  As such, there was ample probable cause to support the warrantless entry into the apartment.  *See United States v. Tobin*, 923 F.2d 1506, 1510 (11th Cir. 1991).

### ii.   *Exigent Circumstances*

With respect to exigent circumstances, the evidence showed that Renteria had picked up a package not addressed to him that had previously contained very dangerous illegal drugs.  Renteria then engaged in anti-surveillance behavior, indicating that he knew that the package contained something illegal and that he was attempting to avoid detection by law enforcement.  Renteria moved the package from his vehicle into the apartment, where an unknown number of people may have been.  And then, shortly thereafter, the tracker was compromised, which showed that

the package had been opened and that the people inside knew that they were under surveillance. These circumstances raised the possibility that the people in the apartment might attempt to destroy evidence. *See Tobin*, 923 F.2d at 1511 (stating that when a suspect becomes aware that he is being watched by law enforcement, destruction of evidence is a real possibility); *United States v. McGregor*, 31 F.3d 1067, 1068 (11th Cir. 1994) (concluding that at the moment a surveillance beeper inside a package sounded, exigent circumstances existed, reasoning that when the suspect discovered the beeper, he would realize that he was being watched and might destroy the drugs). Thus, I conclude that exigent circumstances existed.

### iii.   *Summary*

In summary, I conclude that at the time that law enforcement learned that the tracking device had been compromised, there existed both probable cause and exigent circumstances. As such, the exigencies of this situation made the warrantless entry lawful. Law enforcement did not violate Renteria's Fourth Amendment rights by entering Apartment O-10 without a warrant. *See Tobin*, 923 F.2d at 1511; *McGregor*, 31 F.3d at 1068.

### B.  *The Protective Sweep*

Another exception to the warrant requirement is the protective sweep, which is "a quick and limited search of premises" that is "conducted to protect the safety

of police officers or others." *Maryland v. Buie*, 494 U.S. 325, 327 (1990).  The sweep must be "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*  In ruling on a Fourth Amendment challenge to a protective sweep, courts should consider whether the officers' behavior was objectively reasonable in light of the facts and circumstances. *See United States v. Yarbrough*, 961 F.3d 1157, 1163 (11th Cir. 2020).

Renteria argues that the protective sweep violated his Fourth Amendment rights because the officers did not have a reasonable belief based on specific and articulable facts that the area to be swept harbored an individual posing a danger to those on the incident scene.  [Doc. 69 at 24].  He also argues that the sweep of the bathroom (where the officers observed the empty plastic bag in the toilet) was unnecessary because Sergeant Petron did not need to actually enter the bathroom to see if anyone was hiding there.  [*Id.* at 24–25].

These arguments are not persuasive.  Sergeant Petron testified that because of the counter-surveillance techniques that Renteria had employed on the way to the apartment, the agents stopped following the Honda and elected to rely on the tracking device.   As such, law enforcement did not witness Renteria and his passenger enter the apartment and did not know how many people may have been in the apartment.  Moreover, Sergeant Petron testified that there were multiple vehicles

parked in front of the apartment building, any of which could have been driven by people who might have been hiding in the apartment; the apartment had two levels, which suggested that there were multiple rooms where a person could hide; and the occupants did not promptly come to the door when ordered to do so. Taken together, these facts show that it was reasonable for the officers to believe that a protective sweep was needed to ensure officer safety. *See Yarbrough*, 961 F.3d at 1164–65 (noting that the fact that cars are parked outside a dwelling and the occupants' furtive behavior and refusal to follow police direction could be indications that multiple people may be inside the dwelling who might be non-compliant with commands— facts that support a reasonable suspicion that dangerous persons might be hiding in the house). *See United States v. Williams*, 871 F.3d 1197 (11th Cir. 2017) (concluding that a protective sweep was justified based on, among other things, the layout of the property, suspicious activity, and the fact that multiple cars were in the driveway).

Renteria's complaints regarding the scope of the protective sweep also are not supported by the record. According to the testimony provided at the hearing, the sweep of the apartment was brief, lasting just over one minute. Sergeant Petron testified credibly that the agents did not touch any of the personal effects, and that they checked only those places where someone could hide. And, with respect to the

empty bag found in the toilet, there is no indication that the officers opened the lid on the bowl of the toilet or otherwise looked where they should not have. The testimony indicated that the bag was discovered in plain view during the protective sweep of the bathroom and that the bag was removed from the toilet later, to avoid its inadvertent disposal. I see no issue with the scope of the protective sweep. The officers' actions were objectively reasonable in light of the facts and circumstances. *See United States v. Moore*, 257 F. App'x 254, 256 (11th Cir. 2007) (affirming denial of suppression motion where officers discovered evidence in a bathroom sink during a protective sweep of a hotel room); *United States v. Standridge*, 810 F.2d 1034, 1038 (11th Cir. 1987) (affirming the denial of a motion to suppress where agents observed evidence floating in the toilet during the protective sweep).

### C. The Consent

Finally, Renteria argues that any consent that the officers may have received to search the apartment was invalid because "coercion was inherent under the circumstances" and "the atmosphere was police-dominated." [Doc. 69 at 27–29]. The Eleventh Circuit has identified a non-exhaustive list of factors relevant to the determination of whether consent to a warrantless search is voluntary:

> voluntariness of the defendant's custodial status, the presence of coercive police procedure, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence,

18

and . . . the defendant's belief that no incriminating evidence will be found.

*United States v. Blake*, 888 F.2d 795, 798–99 (11th Cir. 1989) (citations omitted). The determination of whether consent was voluntary, or rather was a product of coercion, is decided based on the totality of the circumstances, and the Government bears the burden of proving voluntariness.  *See id.* at 798.

Here, although there was a significant police presence at the scene, the officers kept their firearms holstered except for the short time they were conducting the protective sweep.  Renteria and the other officers maintained a calm demeanor throughout the encounter.  The only time Sergeant Petron raised his voice was when he yelled for Renteria and Jennyfer to come to the door; afterwards, his tone was conversational.  Although Renteria was briefly detained and handcuffed in a police car during the protective sweep, the handcuffs had been removed and he was returned to the apartment at the time he signed the written consent to search.

Renteria argues that he may have limited understanding of how the American criminal justice system works, but he has provided no evidence to support this possibility, other than that he is a citizen of Mexico who speaks Spanish.  The evidence, however, showed that Renteria indicated that he could read and understand Spanish, was given a written consent form in Spanish that explained his rights with respect to the search, and appeared to actually read the consent form before he signed

it.  There is no evidence that Renteria asked any questions about the consent form, even though Sergeant Petron (who is a native Spanish speaker) was present and offered to answer questions.  In short, none of the factors that suggest police coercion that might render consent involuntary are present here.  Given the totality of the circumstances, I conclude that the consent was voluntary.  *See United States v. Rodriguez Perez*, 798 F. App'x 536, 541 (11th Cir. 2020) (finding consent was voluntary where the non-English speaking defendant provided consent to search his vehicle while in handcuffs, and noting that at the time the officers requested consent, the officers' guns were not drawn and there was no evidence that law enforcement made any threats or committed any acts of coercion).

For all these reasons, I will recommend that the motion to suppress evidence be denied.

## III.   Motion to Suppress Statements

Pursuant to the Fifth Amendment of the United States Constitution, no person "shall be compelled in any criminal case to be a witness against himself."  U.S. CONST. amend. V. Therefore, under *Miranda v. Arizona*, 384 U.S. 436 (1966), "evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983). The Government has the

20

burden to show by a preponderance of the evidence that the defendant made a knowing, voluntary, and intelligent *Miranda* waiver.  *See United States v. Farris*, 77 F.3d 391, 396 (11th Cir. 1996).

An accused effectively waives his *Miranda* rights if he: (1) voluntarily relinquishes his rights as the product of a free and deliberate choice, rather than through intimidation, coercion, or deception; and (2) makes his decision with the full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them.  *See United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995).  That is, a waiver is effective where the "totality of the circumstances surrounding the interrogation reveal[s] both an uncoerced choice and the requisite level of comprehension."  *Id.* (quotation marks omitted).  "An express written or oral statement of waiver . . . is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver."  *See North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  In his motion to suppress statements, Renteria challenges the *Miranda* waiver, arguing that none of his statements were voluntarily

given because the waiver was obtained through coercion.[5]  [Doc. 69 at 29–31].  The

evidence, however, does not support this assertion.

Renteria was verbally advised of his *Miranda* rights in Spanish.  He then

signed a written waiver of those rights in which he affirmed that he had read the

rights, understood them, and nevertheless was willing to answer questions without

an attorney.  The evidence showed that Renteria was calm during this time, and that

law enforcement made no promises or threats to coerce him to waive his rights.

Although Renteria had earlier been detained and handcuffed, by the time that he

waived his *Miranda* rights, he had been un-cuffed and returned to the apartment,

which shows that any pressure Renteria may have felt while in the police cruiser was

alleviated before he waived his rights.  There was no evidence that he ever paused,

hesitated, objected, or asked any questions about the waiver form.  Under these

circumstances, it appears that any statements he made were voluntary. *See United*

*States v. Mwangi*, No. 1:09-cr-107-TWT, 2010 WL 520793, at *7 (N.D. Ga. Feb. 5

---

[5] Renteria also argues that even if he did voluntarily make statements, the statements should nevertheless be suppressed because they are tainted by Fourth Amendment violations caused by the illegal "knock and talk," the expansive and unjustified protective sweep, and the coercion used to obtain consent to search the apartment.  [Doc. 69 at 33–34].  For the reasons discussed above, I have found no such Fourth Amendment violations in the context of the search of the apartment, and I similarly see no basis for those circumstances to support the suppression of any post-*Miranda* statements.

2010) (finding no coercion under similar facts and noting that law enforcement made no threats or promises to obtain the consent).

For these reasons, I will recommend that the motion to suppress statements be denied.

## CONCLUSION

For all the reasons stated, I find no basis for suppression of any of the evidence in this case and therefore **RECOMMEND** that Renteria's motion to suppress statements [Docs. 39, 42] and his motion to suppress evidence [Docs. 40, 43] be **DENIED**.

I have now addressed all referred pretrial matters and have not been advised of any impediments to the scheduling of a trial. Accordingly, Defendant's case is **CERTIFIED READY FOR TRIAL**.

**SO REPORTED AND RECOMMENDED**, this 23rd day of December, 2020.

CATHERINE M. SALINAS
UNITED STATES MAGISTRATE JUDGE

23